# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs April 29, 2008

## STATE OF TENNESSEE v. ERICA LYNN WYMA

### Direct Appeal from the Criminal Court for Hamblen County
### No. 04CR395     John F. Dugger, Jr., Judge

------

### No. E2007-01999-CCA-R3-CD - Filed September 10, 2008

------

The defendant, Erica Lynn Wyma, was convicted of attempted aggravated child abuse, a Class B felony, and sentenced as a Range I, standard offender to eleven years in the Department of Correction. She argues that the evidence was insufficient to support her conviction, the trial court erred in admitting a statement of the victim as an excited utterance, and her sentence is excessive. Following our review, we affirm the judgment of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed

ALAN E. GLENN, J., delivered the opinion of the court, in which THOMAS T. WOODALL, J., joined. JOSEPH M. TIPTON, P.J., filed a concurring opinion.

Greg W. Eichelman, District Public Defender, for the appellant, Erica Lynn Wyma.

Robert E. Cooper, Jr., Attorney General and Reporter; Preston Shipp, Assistant Attorney General; and C. Berkeley Bell, Jr., District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

### State's Proof

The defendant was indicted on a single count of aggravated child abuse. At trial, Dr. Angela Warden testified that she treated the twenty-five-month old victim, Z.B.,[1] on November 20, 2003, for pharyngitis. She said the victim's vision and walking ability were normal at that time. When Dr. Warden treated the victim on March 13, 2007, she found that the victim's right arm and leg were weak and her right eye drifted outward.

------

[1] It is the policy of this court to refer to minor victims by their initials.

Teddy Collingsworth, a criminal investigator with the State Attorney General's office, testified that he interviewed the defendant during his investigation of the cause of the victim's injuries and that she offered inconsistent accounts of how the injuries had occurred. He said she first told him that she was in the bathroom when the victim slipped and fell into the tub. Later, she told him that she was not home when the victim fell and that her boyfriend, Casey Kyle, was the only one present when the victim fell. Collingsworth read into evidence a statement made in his presence by the defendant on December 15, 2003, which read in pertinent part:

On Friday morning, [November] 21, 2003, I got up when [the victim] woke up. It was before 8:00 a.m. I was agitated toward everything. Sometimes when I get up, I wake up in a weird mood. I fed [the victim], and she was crying, and I don't know why; I don't know if she was in a crying mood, or didn't feel good. I remember we were in the living room, and I kept asking her what she wanted. She just kept crying, saying, Mommy.

I got upset more. I don't remember when I get upset what I do.

I was sitting on the couch, and she was standing in front of me. I grabbed her on her arms and started shaking her. I kept shaking. I kept asking her what she wanted. She just kept crying. I don't remember if I did anything else to her or if I hurt her.

The next thing I remember, we were playing cards. I didn't mean to do it on purpose. It was an accident. Casey [Kyle] was not there, and Jason [Jarme, the defendant's brother] was in the bed asleep.

On cross-examination, Collingsworth acknowledged that he called the defendant "a liar" when she came to speak with him because he believed she had been untruthful when she told investigators that the victim's injuries were the result of a bathtub fall. He testified that the defendant's December 15 statement was transcribed by Detective Vickie Arnold and that when the statement was completed, he read it to the defendant who reviewed it, made corrections, and signed it.

Dr. Ramsey Larson, medical director of the emergency department at Morristown-Hamblen Hospital, testified that he examined the victim on November 22, 2003, and found that she had difficulty moving her right arm and standing on her right leg. He said he asked Dr. Imtiaz, the pediatrician on call that evening, to examine the victim because it was unusual to see such injuries in a child.

Detective Vickie Arnold of the Morristown Police Department testified that she was summoned to East Tennessee Children's Hospital in Knoxville on November 22, 2003, to investigate a possible child abuse. She located the victim in the pediatric intensive care unit and noticed that she was unresponsive. She then spoke with the defendant, who told her that she was in another room

when she heard the victim fall in the bathtub. Detective Arnold said that on November 24 she again spoke with the defendant, who said she previously had lied about being home when the victim fell. The defendant gave a statement, which read in pertinent part:

> I was with my mom, Wendy Shirles, helping her move, helping Wendy move, so Casey [Kyle] gave [the victim] a bath. Casey's ex-girlfriend, Tammy, came by, and Casey told [the victim] to wait there while he went to the door. After he went to the door, and he said he heard a boom, and he went back to the bathroom, and [the victim] was standing up crying. So he got her out of the bathtub – bathroom and put her clothes on her and he set her up on the couch and watched T.V. After a while she started dozing off and he put her in her bed.

> I got home around 9:30 p.m. and Casey told me what had happened. My brother, Jason, 22 years of age, was also there. When I got home, he told me that she seemed to be doing okay. Jason then left.

> When Jason came back at 2:00 to 2:30 a.m., Casey and I were in the living room. Casey was lying, dozing, on the mattress we put in the living room. Jason saw [the victim] lying in the floor of the bedroom and whining, crying, but not a lot. He picked her up and brought her to me.

> I held her and gave her to Casey. She started throwing up, and I noticed that she had thrown up clear and macaroni. I waited 30 minutes – Clear liquid and macaroni. I waited 30 minutes. I gave her her medicine and laid her on the couch.

> At 4:00 a.m. she got back up. I was holding her, and Casey got up around 6:45 or 7:00 a.m. [The victim] got up with Casey. Casey asked [the victim] . . . if she wanted anything to eat, and she said yes. Casey said that then [the victim] couldn't get up, and I was concerned.

> We started getting dressed and took her to the hospital. We got up at the hospital, M.H.E.R., around 8:30 a.m., and after she was seen there, she was transferred to [East Tennessee] Children's Hospital.

Dr. Christopher Miller, a pediatric neurologist, testified that on November 22, 2003, he spoke with the defendant, who told him that the victim had fallen in the bathtub the previous night. He examined the victim that day and observed a retinal hemorrhage in her left eye. He ordered an opthalmological exam which showed retinal hemorrhage present in both eyes. A neurologic examination revealed that the victim had difficulty moving her right side. Computerized tomography (CT) and magnetic resonance imaging (MRI) scans disclosed a hemorrhage overlying the left side of the victim's brain. Dr. Miller opined that the history given to him by the defendant did not explain the injuries he observed and the reports he reviewed, because a fall occurring in a bathtub would not create sufficient trauma to produce the bleeding observed in the victim's retinas and brain.

He testified that, in his opinion, the victim had suffered "some element of trauma," and shaking could explain her injuries. Dr. Miller examined the victim on April 19, 2007, and found that she remained partially paralyzed and had a clear asymmetry in fine motor dexterity.

On cross-examination, Dr. Miller testified that there was a history of stroke and migraine headaches in the victim's family. He said the victim's grandmother reported that the victim had experienced an episode of severe head pain the previous month. He testified that the victim displayed no broken bones, bruises, or signs that she had been squeezed or held tightly under her arms. He stated that during her April 2007 examination the victim was able to walk and talk and was "animated." On redirect examination, Dr. Miller testified that when he spoke to the defendant immediately after the victim's injury, the defendant denied any history of shaking or trauma.

Dr. Sidney Roberts, a pediatric radiologist, examined the victim's CT and MRI scans and found a subdural hematoma, or hemorrhage, along the surface of her brain. He testified that trauma was the usual cause of blood on the surface of the brain. The MRI scan also revealed ischemia, or lack of blood flow, in several areas of the victim's brain. In Dr. Roberts' opinion, the ischemia stemmed from blood along the victim's brain acting as an irritant and causing blood vessels in her brain to spasm and tighten. Responding to a hypothetical question, Dr. Roberts stated that the victim's injuries were consistent with an episode of violent shaking. On cross-examination, Dr. Roberts testified that other types of trauma, including whiplash, a football collision with a helmet on a goalpost, or a fall could cause injuries similar to the victim's injuries.

Dr. Gary Gitschlag, a pediatric ophthalmologist, testified that he examined the victim on November 24, 2003, and found "extensive" retinal hemorrhages on the inside of both eyes. Responding to a hypothetical question, he stated that this finding was consistent with the victim having been shaken. He testified that although the victim's hemorrhages eventually cleared, she experienced changes to the architecture of her right eye which caused it not to fixate or look centrally at a target. He said this injury was "probably" permanent because there had been no improvement in the fixation for more than a year.

Dr. Joseph Childs, a pediatric intensive care physician, testified that he examined the victim on November 22, 2003. His findings were consistent with those of Drs. Miller, Larson, and Roberts, and he said these findings were consistent with the victim having been shaken. He said he considered other possible causes, including history from the family and blood disorders, and found none that could explain his findings. On cross-examination, Dr. Childs testified that although not all retinal hemorrhages are caused by shaking, significant force "such as a high-speed car accident or a fall from a tremendous height," would be required to generate injuries as serious as the victim's.

Wendy Shirles, who was dating Jason Jarme at the time of trial, testified that on November 21, 2003, the defendant came to her house with the victim at around 8:30 a.m. to help her move. When they arrived, Shirles noticed that the victim's eyes were red and swollen from crying. At around 5:30 p.m. she and the defendant took the victim back to the defendant's house and left her with Casey Kyle. They resumed moving Shirles's belongings until around 9:30 p.m., when Shirles

took the defendant home. Shirles testified that the defendant came to her house "a couple of weeks later" and told her that she had been up all night on November 20, 2003, doing cocaine, drinking, and playing cards with Kyle and some neighbors. Shirles said the defendant told her that the victim was crying persistently the next morning, so she picked the victim up, shook her, and threw her down on the couch.

Stephanie Avery testified that in 2003 she worked in private healthcare as a caregiver and was hired to ensure that the victim's needs were met while she was in the hospital. She said that on November 26, 2003, she arrived to sit with the victim around 8:00 a.m. She said she held and rocked the victim while playing movies on the television and reading her a book. At some point, she laid the victim down because she appeared restless and agitated. Ms. Avery turned on a movie, then heard the victim make a mumbling noise. She testified that she drew closer to the victim and heard her say "Mommy, stop." Over defense objection, Ms. Avery was permitted to review a statement she gave to a detective the following day and, after refreshing her memory, testified that the victim screamed, "No, no," as if she were defending herself and said, "Mommy hit me."

### Defense Proof

Callie Clark testified that the defendant and the victim came to help her and Wendy Shirles move on November 21, 2003. She stated that the victim left between 5:00 and 5:30 p.m. and that she did not have any occasion to take the victim to a doctor that day.

Casey Kyle, the defendant's husband,[2] testified that on November 21, 2003, he worked until around 4:30 or 5:00 p.m., then returned home because the defendant had asked him to watch the victim. He stated he was preparing dinner, giving the victim a bath, and speaking with his son's mother when he heard a splash in the bathtub. He ran into the bathroom and discovered the victim standing up and crying. He asked if she was all right, and when she responded in the affirmative, he dressed her, fed her dinner, and kept her awake for approximately two hours.

Around 8:30 p.m., shortly after Kyle put the victim to bed, Jason Jarme returned home and Kyle asked him to check on the victim. The defendant returned home around 9:30 p.m., and Kyle asked her to check on the victim as well; both Jarme and the defendant reported that the victim was fine. Kyle and the defendant went to sleep and were awakened at about 1:30 a.m. by Jarme, who said he found the victim lying on the floor. The victim then began vomiting and the defendant gave her medicine. When Kyle woke the victim at 6:00 a.m. to feed her before he went to work, he noticed that she was having difficulty moving the right side of her body.

Tammy Pinkston, the mother of Casey Kyle's son, testified that their son had been with Kyle the previous weekend and had left his jacket with him. She drove to Kyle's residence on November 21, 2003, to retrieve the jacket, and Kyle threw the jacket to her from an upstairs patio. After the two exchanged words, Pinkston left.

---

[2] Kyle and the defendant married in 2005.

James Wigfall,[3] the defendant's stepfather, testified that the victim lived with him, was attending school, and was an active child.

Donna Wigfall, the defendant's mother, testified that she had custody of the victim, who was doing well in school and was interested in basketball. She said she had never heard the victim cry out spontaneously in fear of the defendant. She stated that the victim still has weakness on her right side and wears safety glasses.

The defendant testified that before November 2003, the victim had asthma but was otherwise healthy. She stated that she scheduled a doctor's appointment for November 20, 2003, after noticing that the victim had sores in her mouth and was vomiting. She had to take a G.E.D. test that day, so her mother and brother took the victim to the doctor. The defendant denied that any alcohol or drugs were consumed at her house that night. The defendant testified that she awakened about 8:00 a.m. the next morning and fed the victim, who was crying because she did not feel well. She played cards and danced with the victim who told her she wanted to go to Wendy Shirles's house. The defendant and the victim went to Shirles's house where the defendant helped Shirles move until around 5:30 p.m. After taking the victim home to stay with Kyle, the defendant returned to Shirles's house. When the defendant returned home around 9:30 p.m., Kyle told her that she should check on the victim because she had fallen earlier. She did so, found the victim to be well, and lay with her until the victim fell asleep. Once the victim was asleep, the defendant returned to the living room. Jarme returned home around 1:00 a.m.; shortly thereafter, the defendant fell asleep in the living room. Around 1:30 or 2:00 a.m., Jarme brought the victim into the living room and told the defendant that he found her on the floor crying. The victim vomited, so the defendant gave her some cold water, medicine, and a breathing treatment. The defendant kept the victim with her in the living room, and both returned to sleep. Kyle woke the defendant around 7:00 or 7:30 a.m. and told her that the victim could not get up. The defendant helped the victim up, but she could not stand and nearly fell before Kyle caught her. The defendant and Kyle then took the victim to Hamblen Hospital in Morristown.

The defendant testified that her bathtub was made of porcelain, with sides about one foot from the floor. She said that other than the fall described to her by Kyle, she knew of no event that could have hurt the victim on November 21. She stated that she originally lied and told Dr. Miller that she was home with the victim when the accident occurred because she was afraid the State would take the victim from her custody. She acknowledged that she also told a detective on November 23, 2003, that she had been present when the victim fell.

The defendant said she met with Detective Arnold and Investigator Collingsworth on December 15, 2003, and told them she was not home when the victim fell. She said Detective Arnold told her that dancing with the victim or tossing her into the air was considered shaking. She

---

[3]We note that the witness's name is spelled "Wheatfall" in the trial transcript but is spelled "Wigfall" in the transcript of the sentencing hearing. We will use the "Wigfall" spelling because the last name of the witness's wife is spelled "Wigfall" in the trial transcript.

testified that Investigator Collingsworth told her she was a liar because she did not look into his eyes when speaking to him. She said that, although Detective Arnold told her she was free to leave at any time, she did not leave because she feared she would get into trouble. She acknowledged that at this meeting she signed the statement read into evidence by Investigator Collingsworth but said she signed it because she was "agitated," "upset," and "wanted to get out of there."

Asked about her statement to investigators, "I don't remember when I get upset what I do," the defendant said, "I didn't know how to answer the question that [Detective Arnold] asked me . . . so I just answered to any old thing." She denied getting so upset that she did not remember her actions and said she remembered fully what happened on the morning of November 21, 2003. She repudiated the passage from the statement that "I grabbed [the victim] on her arms and started shaking her," and said she showed Detective Arnold that she was dancing with the victim and not shaking her. Asked about the sentence, "I didn't mean to do it on purpose, it was an accident," the defendant testified:

> That sentence was when I described to her what I was – what me and the baby was doing, dancing. That was when she had told me that that was considered shaking my child. And I explained to her, I said, Well, if that's considered shaking my child, if that's how you're putting it, I'm sorry, you know, I was just dancing with my child, having, you know, playing, having, playing, having a moment . . . with my child.

> I didn't know that was considered shaking. I never heard of that being considered a shaking.

> I wasn't confessing saying that I done it. I didn't hurt my child. I wouldn't have never hurt no child or any other child.

The defendant denied telling Shirles that she shook the victim and threw her on a couch. She recalled speaking with Shirles but said she told Shirles that she had been accused by Detective Arnold of shaking the victim and did not tell her that she actually shook the victim. On cross-examination, the defendant testified that she did not remember Detective Arnold transcribing any of the December 15 statement. Regarding the statement, "Sometimes when I get up, I wake up in a weird mood," the defendant stated that she did not know how to answer the question she was asked, so she "just started talking" and "answered it the best way I could." Contrary to her testimony on direct examination, she denied telling Investigator Collingsworth, "I don't remember when I get upset what I do." She further denied stating, "I don't remember if I did anything else to [the victim] or if I hurt her." She reiterated that she never shook or hurt the victim and only danced with her on the morning of November 21, 2003.

### State's Rebuttal Proof

In rebuttal, the State recalled Investigator Collingsworth, who testified that he read the December 15 statement to the defendant. He stated that he asked the defendant to demonstrate how

she shook the victim, and the defendant replied that she placed one hand on each of the victim's shoulders and shook her. On cross-examination, he testified that he did not recall discussing with the defendant whether dancing could involve shaking or injure someone if performed too vigorously.

Following deliberations, the jury found the defendant guilty of the lesser-included offense of attempted aggravated child abuse. At the sentencing hearing, Casey Kyle testified that he worked two jobs and that the defendant worked as a housekeeper at Quality Inn. He stated that he and the defendant did not use drugs or alcohol but later acknowledged that he "might have a beer or two." He said he would like the defendant to stay home and did not believe she was guilty. On cross-examination, Kyle testified that one day, while the defendant was at school or work, Jason Jarme locked the victim in a closet because she was "whining." He said he and the defendant ordered Jarme to leave the house following this incident, but the defendant later allowed him to return. Kyle acknowledged a prior drug conviction, charge of harassment, and failure to pay child support.

James Wigfall, the defendant's stepfather and the victim's current custodial parent, identified several pictures of the victim and testified that she was a happy, active, and intelligent child. He testified that she could move her arms, legs, fingers, and toes but said her left eye was still weak. Responding to questioning from the court, Wigfall stated that the victim wore glasses to protect her stronger eye.

The court found no mitigating factors and a sole enhancement factor, that the defendant abused a position of private trust. See Tenn. Code Ann. § 40-35-114(14) (2006). According that factor great weight, the court enhanced the defendant's sentence from eight years to eleven years.

### ANALYSIS

The defendant argues that (1) the evidence was insufficient to support her conviction; (2) the trial court erred in admitting into evidence a statement by the victim to a caregiver; and (3) her sentence is excessive. The State contends that the evidence was sufficient and the trial court did not err in admitting the victim's statement or sentencing the defendant. After careful analysis, we agree with the State.

### I. Sufficiency of the Evidence

Where sufficiency of the convicting evidence is challenged, the relevant question for the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)).

A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The defendant was convicted of attempted aggravated child abuse. A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:

> (1) Intentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be;

> (2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or

> (3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

Tenn. Code Ann. § 39-12-101(a) (2003). Conduct does not constitute a substantial step toward the commission of the offense unless the person's entire course of action is corroborative of the intent to commit the offense. It is no defense to prosecution for criminal attempt that the offense attempted was actually completed. Id. (b), (c).

At the time the defendant committed the offense,[4] Tennessee Code Annotated section 39-15-402 provided in pertinent part:

> (a) A person commits the offense of aggravated child abuse or aggravated child neglect who commits the offense of child abuse or neglect as defined in § 39-15-401 and:
>
> > (1) The act of abuse or neglect results in serious bodily injury to the child; or
> >
> > (2) A deadly weapon is used to accomplish the act of abuse.
>
> (b) A violation of this section is a Class B felony; provided, however, that, if the abused or neglected child is six (6) years of age or less, the penalty is a Class A felony.

Tenn. Code Ann. § 39-15-402 (2003). Section 39-15-401 stated in part:

> Any person who knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury or neglects such a child so as to adversely affect the child's health and welfare commits a Class A misdemeanor; provided, however, that if the abused or neglected child is six (6) years of age or less, the penalty is a Class D felony.

Tenn. Code Ann. § 39-15-401(a) (2003).

The defendant argues that the evidence was insufficient because the jury found the defendant not guilty of aggravated child abuse. As we understand her, she argues that acquittal on the completed offense of aggravated child abuse is tantamount to a rejection of the factual basis underlying the lesser-included offense of attempted aggravated child abuse. However, this court has previously held that a substantially similar argument is without merit. In State v. Alecia Diane Cooper, No. M2006-02618-CCA-R3-CD, 2007 WL 2350097, at *5 (Tenn. Crim. App. Aug. 14, 2007), the defendant was charged with assault and convicted of the lesser-included offense of attempt to commit assault. On appeal, she argued that her conviction for criminal attempt could not stand because her acquittal on the greater offense necessarily meant that the jury rejected the factual premise that she assaulted the victim. This court disagreed, holding that "[w]hen 'the evidence [is] sufficient to support [a] conviction [of] the greater offense charged, the defendant cannot complain of the jury finding [her] guilty of the lesser offense.'" Id. at *6 (quoting McDonald v. State, 512 S.W.2d 636, 640 (Tenn. Crim. App. 1974)).

---

[4]Sections 39-15-401 and -402 were both amended in 2005.

Viewing the evidence in the light most favorable to the State, the jury heard testimony from Investigator Collingsworth and Wendy Shirles that the defendant admitted shaking the victim on the morning before she was taken to the hospital and from the victim's treating physicians that she suffered a subdural hematoma and retinal hemorrhages in both eyes. Drs. Roberts and Childs testified that their findings were consistent with the victim having been shaken. Dr. Gitschlag testified that the victim suffered a permanent change in the architecture in her right eye that affected her ability to fixate on a target. Although the defendant and Casey Kyle testified that the victim's injuries resulted from a fall into a bathtub, Dr. Miller testified that, in his opinion, the victim's injuries could not have been caused by such a fall. This evidence was sufficient for a rational jury to find the defendant guilty of both aggravated child abuse and attempted aggravated child abuse. It is of no consequence that the jury found the defendant not guilty of the greater offense and guilty of the lesser offense.

## II. Admission of Victim's Out-of-Court Statement

The defendant argues that the trial court erred in permitting Stephanie Avery, the victim's caregiver, to testify that the victim said, "No, no" and "Mommy hit me" while in her hospital bed on November 26, 2003. The trial court ruled that these statements were admissible under the excited utterance exception to the hearsay rule.

Hearsay, an out-of-court statement offered to prove the truth of the matter asserted, is generally inadmissible. See Tenn. R. Evid. 801-802. However, excited utterances, statements relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition, are not excluded by the hearsay rule. Tenn. R. Evid. 803(2). There is a twofold rationale for admitting excited utterances:

> "First, since this exception applies to statements where it is likely there was a lack of reflection--and potential fabrication--by a declarant who spontaneously exclaims a statement in response to an exciting event, there is little likelihood, in theory at least, of insincerity. . . . Second, ordinarily the statement is made while the memory of the event is still fresh in the declarant's mind. This means that the out-of-court statement about an event may be more accurate than a much later in-court description of it."

State v. Stout, 46 S.W.3d 689, 699 (Tenn. 2001) (quoting Neil P. Cohen et al., Tennessee Law of Evidence, § 803(2).1, at 532 (2d ed. 1995)), superseded by statute on other grounds as stated in State v. Odom, 137 S.W.3d 572 (Tenn. 2004).

The first requirement, that there be a startling event or condition, is broadly construed, encompassing any event "sufficiently startling to suspend the normal, reflective thought processes of the declarant." Stout, 46 S.W.3d at 699. The second requirement, that the statement relate to the startling event or condition, is satisfied if the statement describes all or part of the event or condition, or deals with the effect or impact of that event or condition. Id.

The third requirement, that the statement be made while the declarant is under the stress or excitement from the event or condition, relates most directly to the underlying rationale for the exception. In State v. Smith, 857 S.W.2d 1, 9 (Tenn. 1993), we said that "[t]he ultimate test is spontaneity and logical relation to the main event and where an act or declaration springs out of the transaction while the parties are still laboring under the excitement and strain of the circumstances and at a time so near it as to preclude the idea of deliberation and fabrication."

Id. at 699-700. The time interval between the startling event and the declarant's statement is only one consideration in determining whether this third requirement is satisfied and is not dispositive. "Other relevant circumstances include the nature and seriousness of the event or condition; the appearance, behavior, outlook, and circumstances of the declarant, including such characteristics as age and physical or mental condition; and the contents of the statement itself, which may indicate the presence or absence of stress." Id. at 700 (citations omitted).

Applying the three-part analysis to the victim's statement, we first conclude that there was a startling event and that the statement was related to it. The startling event was the trauma which caused the victim's injuries, and the statement was directly related to it – the victim's statement, "No, no" and "Mommy hit me" described what caused the trauma and who inflicted it. Although five days had elapsed between the startling event and the victim's statement, we conclude that the statement was made while the victim was under the stress of the startling event. The victim's age when she made the statement, twenty-five months, is highly significant. Where the declarant is a young child, "the examination of the temporal proximity of the event and declaration merits considerable latitude.... [Y]oung children, especially following stressful experiences, are not adept at reasoned reflection and are therefore less apt to concoct false stories."[5] State v. Charles L. Williams, No. M2005-00836-CCA-R3-CD, 2006 WL 3431920, at *11 (Tenn. Crim. App. Nov. 29, 2006) (citation omitted). Moreover, the victim was still hospitalized when she made the statement, lending further support to our conclusion that the stress of the startling event was ongoing. Finally, it is of paramount significance that the victim uttered the statement spontaneously. Stephanie Avery, the caretaker, testified that she heard the statement after noticing that the victim had begun mumbling and speaking on her own. This court said, in Charles L. Williams, that "spontaneity is the key factor in determining whether a statement falls within the excited utterance exception" and "the lapse of time after the occurrence of an event is not as important as the condition of the speaker's mind." 2006 WL 3431920, at *9 (citation omitted). We conclude that the trial court did not err in admitting the victim's statement as an excited utterance.

---

[5]We note that other jurisdictions, when analyzing statements made by young children under similar circumstances, have admitted as excited utterances statements made several days after the startling event. See State v. Richard L. Nitz, Jr., No. CA2003-09-228, 2004 WL 2786018, at *4 (Ohio Ct. App. Dec. 6, 2004) (six-year-old child abuse victim's statement made one week after startling event); State v. Rogers, 428 S.E.2d 220, 226 (N.C. Ct. App. 1993) (five-year-old sexual assault victim, three days); Commonwealth v. Bailey, 510 A.2d 367, 368 (Pa. Super. Ct. 1986) (nine-year-old sexual assault victim, two days).

### III. Sentencing

The defendant argues that her sentence is excessive because "the [t]rial [c]ourt improperly weighted the enhancement factor against her in relation to all mitigation." She argues that the trial court should not have enhanced her sentence from eight to eleven years because she had no significant prior criminal history and was "married comfortably" to Casey Kyle. The State argues that the trial court properly sentenced the defendant.

When an accused challenges the length, range, or manner of service of a sentence, it is the duty of this court to conduct a *de novo* review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d) (2003). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The presumption does not apply to the legal conclusions reached by the trial court in sentencing the accused or to the determinations made by the trial court which are predicated upon uncontroverted facts. State v. Butler, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); State v. Smith, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994); State v. Bonestel, 871 S.W.2d 163, 166 (Tenn. Crim. App. 1993), overruled on other grounds by State v. Hooper, 29 S.W.3d 1, 9 (Tenn. 2000). However, this court is required to give great weight to the trial court's determination of controverted facts as the trial court's determination of these facts is predicated upon the witnesses' demeanor and appearance when testifying.

In conducting a *de novo* review of a sentence, this court must consider (a) any evidence received at the trial and/or sentencing hearing, (b) the presentence report, (c) the principles of sentencing, (d) the arguments of counsel relative to sentencing alternatives, (e) the nature and characteristics of the offense, (f) any mitigating or enhancement factors, (g) any statements made by the accused in his own behalf, and (h) the accused's potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-103, -210; State v. Taylor, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001).

The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401, Sentencing Commission Cmts.; Ashby, 823 S.W.2d at 169. In this case, the defendant has the burden of illustrating the sentence imposed by the trial court is erroneous. If our review reflects that the trial court, following the statutory sentencing procedure, imposed a lawful sentence, after having given due consideration and proper weight to the factors and principles set out under the sentencing law and made findings of fact that are adequately supported by the record, then we may not modify the sentence even if we would have preferred a different result. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

At the time the defendant committed the offense, the presumptive sentence for a defendant who was a Range I, standard offender convicted of a Class B felony was eight years. Tenn. Code Ann. § 40-35-112 (2003). The trial court enhanced the defendant's sentence to eleven years based on its finding of one enhancement factor–that the defendant abused a position of private trust. The

defendant's primary argument is that the trial court improperly weighed this enhancement factor. However, as she acknowledges, "[t]he weight to be afforded an existing [enhancement] factor is left to the trial court's discretion so long as it complies with the purposes and principles of the 1989 Sentencing Act and its findings are adequately supported by the record." State v. Kelley, 34 S.W.3d 471, 479 (Tenn. Crim. App. 2000). The trial court found that the position of trust enhancement factor was entitled to great weight because the defendant is the victim's mother and had a paramount duty to protect and care for her. The record supports the sentencing determination of the trial court. The defendant is not entitled to relief.

## CONCLUSION

Based on the foregoing authorities and reasoning, the judgment of the trial court is affirmed.


_____
ALAN E. GLENN, JUDGE